# UNITED STATES *v.* AETNA CASUALTY & SURETY CO.

NO. 35.

Argued October 19–20, 1949.—Decided December 12, 1949.

*Leavenworth Colby* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Samuel D. Slade* and *Joseph Kovner.*

*William A. Hyman* argued the cause for respondent in No. 35. With him on the brief were *Harold W. Hayman* and *Melville Harris.*

By special leave of Court, *Jackson G. Akin, pro hac vice,* argued the cause for respondent in No. 36. *Pearce C. Rodey* was on the brief.

*Abraham Frankel* argued the cause and filed a brief for respondents in Nos. 37 and 38.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

These cases, here on certiorari, present this important question under the Federal Tort Claims Act:[1] May an

---

[1] 60 Stat. 842; formerly codified as 28 U. S. C. § 931 *et seq.* The new Judicial Code became effective on Sept. 1, 1948, while these actions were pending on appeal, and the provisions formerly embodied in the Tort Claims Act are now distributed through various chapters of the new Code.

insurance company bring suit in its own name against the United States upon a claim to which it has become subrogated by payment to an insured who would have been able to bring such an action? That question, in turn, requires our consideration of R. S. 3477, the "anti-assignment" statute.[2]

Three cases, each presenting a slightly different aspect of the problem, were heard by the Court. In No. 35, the complaint alleges that an employee of the Federal Reserve Bank of New York was injured as a result of the negligence of a United States Post Office Department employee. Respondent insurance carrier had insured the Federal Reserve Bank against its liability for workmen's compensation, and duly paid the injured person's claim under the New York Workmen's Compensation Law. The complaint further alleges that the injured person failed to commence any action against the United States within one year after the accident, and that his inaction operated, according to New York law,[3] as an assignment to the insurer of his cause of action against the United States. The District Court dismissed the complaint, 76 F. Supp. 333, but the Court of Appeals for the Second Circuit reversed and remanded the cause for trial. 170 F. 2d 469.

In No. 36, the Government's motion to dismiss the complaint was denied, and, after trial, it was found as fact that an employee of the United States Forest Service had negligently driven a Government vehicle into a vehicle owned by one Harding, causing damages of $1,484.50;

---

[2] 10 Stat. 170 as amended; 31 U. S. C. § 203.

[3] When this action was brought, § 29 of the New York Workmen's Compensation Act provided that if an injured employee has taken compensation but has failed to commence action against the tortfeasor within one year after the cause of action accrued, "such failure shall operate as an assignment of the cause of action against such other . . . to the person, association, corporation, or insurance carrier liable for the payment of such compensation."

that Harding was insured by the respondent insurance carrier and, pursuant to the terms of the policy, had been paid $784.50 by the insurer, to which it was now subrogated. Judgment was thereupon entered against the United States in favor of Harding for $700.00 and in favor of respondent insurance company for $784.50. The Court of Appeals for the Tenth Circuit affirmed.

Nos. 37 and 38 present the situation in which two insurance companies, each of which has paid part of a claim of loss occasioned by the negligence of an employee of the United States, bring suits in their own names, each asking recovery of the amount it has paid to the assured. The District Court dismissed the complaints on motion of the Government, but the Court of Appeals for the Third Circuit reversed and remanded the causes. 171 F. 2d 374.

We granted certiorari in these cases, 336 U. S. 960, because of a conflict of decisions in the circuits [4] and the manifest importance of the question.

The Federal Tort Claims Act provides in pertinent part that

". . . the United States district court for the district wherein the plaintiff is resident or wherein the act or

---

[4] Courts of Appeals in seven circuits have upheld the right of subrogees to sue under the Tort Claims Act. *State Farm Mutual Liability Insurance Co.* v. *United States,* 1st Cir., 172 F. 2d 737; *Aetna Casualty & Surety Co.* v. *United States,* 2d Cir., 170 F. 2d 469; *Yorkshire Insurance Co.* v. *United States,* 3d Cir., 171 F. 2d 374; *United States* v. *South Carolina State Highway Dept.,* 4th Cir., 171 F. 2d 893; *Old Colony Insurance Co.* v. *United States,* 6th Cir., 168 F. 2d 931; *National American Fire Insurance Co.* v. *United States,* 9th Cir., 171 F. 2d 206; *United States* v. *Chicago, R. I. & P. R. Co.,* 10th Cir., 171 F. 2d 377.

The Court of Appeals for the Fifth Circuit reached a contrary conclusion, *United States* v. *Hill,* 171 F. 2d 404, Judge Hutcheson dissenting. Reargument was ordered before the full bench and, upon reconsideration, the original opinion was modified, 174 F. 2d 61, Judge Hutcheson concurring in the result "as in substantial accordance with the views the dissent expressed."

omission complained of occurred, . . . sitting without a jury, shall have exclusive jurisdiction to hear, determine, and render judgment on any claim against the United States, for money only, . . . on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury, or death in accordance with the law of the place where the act or omission occurred. Subject to the provisions of this chapter, the United States shall be liable in respect of such claims to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances . . . ." [5]

While the language of the Act indicates a congressional purpose that the United States be treated as if it were a private person in respect of torts committed by its employees, except for certain specific exceptions enumerated in the Act,[6] neither the terms of the Act nor its legislative history precludes the application of R. S. 3477 in this situation.

It is the Government's position that R. S. 3477, which in terms makes "All transfers and assignments . . . of any claim upon the United States, or of any part or share thereof, or interest therein . . . absolutely null and void . . ." except for assignments made after payment of the claim and in accordance with certain prescribed safeguards, includes assignments by operation of law and prohibits suit by the subrogee in its own name. Petitioner

---

[5] Formerly 28 U. S. C. § 931. This section is now divided and, with immaterial changes, appears in 28 U. S. C. §§ 1346 (b) and 2674.

[6] See 28 U. S. C. § 2680.

reads R. S. 3477 not as prohibiting transfer of a claimant's substantive rights to an insurer-subrogee and ultimate recovery by the insurer but as a procedural requirement that the insurance carrier sue and recover judgment in the name of the original claimant. *United States* v. *American Tobacco Co.,* 166 U. S. 468 (1897). Its purpose in invoking the anti-assignment statute is said to be two-fold: "(1) to insure that the United States may avoid involvement in any litigation as to the existence or extent of subrogation or other assignment of such claims; and (2) to insure that the suits and any judgments against the United States will be in the names of the original claimants so that the United States will be able to avail itself of its statutory rights in respect of venue, and of counterclaim and offset on account of any cross-claims it may have against the original claimants." It is pointed out that "the provisions of the statute making void an assignment or power of attorney by a Government contractor are for the protection of the Government. *Hobbs* v. *McLean,* 117 U. S. 567, 576; *McGowan* v. *Parish,* 237 U. S. 285, 294, 295. In the absence of such a rule, the Government would be in danger of becoming embroiled in conflicting claims, with delay and embarrassment and the chance of multiple liability." *Martin* v. *National Surety Co.,* 300 U. S. 588, 594 (1937). The Government contends that the inconvenience, administrative and accounting difficulties, and procedural problems which, it is apprehended, may involve the Government if subrogees are permitted to bring suits under the Tort Claims Act in their own names make this an apt situation for application of R. S. 3477, and that that was the congressional intent.

It should be noted at the outset, however, that in the courts below and until argument in this Court (and even in its petition for certiorari) the Government contended that R. S. 3477 was a complete bar to recovery by a

subrogee. Only in brief and argument here was it suggested that the insurance carrier could recover if suit was brought in the name of the insured to the use of the insurer, citing for the first time *United States* v. *American Tobacco Co., supra,* a decision reflecting common-law procedure, upon which reliance is now placed.[7] It is for that reason that the opinions below were focused upon whether R. S. 3477 is an absolute bar to recovery by the subrogee rather than merely a bar to recovery in the name of the subrogee. We think, however, that even this limited, and somewhat anomalous,[8] reliance upon R. S. 3477 is untenable, first, because of the uniform interpretation given that statute by this Court for the past 75 years, and, second, because of many affirmative indications of congressional intent that subrogation claims should not be excluded from suit in the name of the subrogee under the Tort Claims Act.

---

[7] This contention was also made in reargument of *United States* v. *Hill,* before the Court of Appeals for the Fifth Circuit, which took place after certiorari was granted by this Court. See note 4.

[8] Petitioner's argument is, in effect, that R. S. 3477 does not prevent the assignment of substantive rights against the United States but merely controls the method of procedure by which the assignee may recover. This position is in square conflict with *Spofford* v. *Kirk,* 97 U. S. 484, and is not justified by anything said in *Martin* v. *National Surety Co.,* 300 U. S. 588. Furthermore, it would require that the real party in interest provisions of the Federal Rules of Civil Procedure, Rule 17 (a), be disregarded, despite the fact that they are made specifically applicable to suits under the Tort Claims Act, and that suits against the Government in which a subrogee owns the substantive right be conducted according to the old common-law procedures in effect prior to the promulgation of the Federal Rules. Petitioner admits as much by its reliance upon *United States* v. *American Tobacco Co.,* 166 U. S. 468. This is not to say that R. S. 3477 was "repealed" by the Federal Rules, but that a new interpretation of the statute which is incompatible with the Rules, as expressly incorporated in the Tort Claims Act, must be clearly justified.

R. S. 3477 was enacted in 1853 as part of a statute entitled "An Act to prevent Frauds upon the Treasury of the United States." [9] Its primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government.[10] *Spofford* v. *Kirk,* 97 U. S. 484, 490 (1878). Another purpose, that upon which the Government now relies, has been inferred by this Court from the language of the statute. That purpose was to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant. *Spofford* v. *Kirk, supra; Goodman* v. *Niblack,* 102 U. S. 556, 560 (1881). Most of the early cases construed the statute strictly, holding that all assignments were included within the statute and that such assignments conferred no rights of any kind upon the assignee; that R. S. 3477 "incapacitates every claimant upon the government from creating an interest in the claim in any other than himself." *Spofford* v. *Kirk, supra,* pp. 488–89. See also *National Bank of Commerce* v. *Downie,* 218 U. S. 345 (1910); *Nutt* v. *Knut,* 200 U. S. 12 (1906); *St. Paul & Duluth R. Co.* v. *United States,* 112 U. S. 733 (1885).

The rigor of this rule was very early relaxed in cases which were thought not to be productive of the evils which the statute was designed to obviate. And one of the first such exceptions was to transfers by operation of law. In *United States* v. *Gillis,* 95 U. S. 407 (1877), the Court held that a provision in the Act creating the Court

---

[9] 10 Stat. 170.

[10] Other sections of the Act made it unlawful for officers of the United States or Members of Congress to have any interest in claims against the Government or to act for claimants, penalized bribery or undue influencing of Members of Congress, and prohibited the destruction or withdrawal of public records.

of Claims that suits on assignments may be brought in the name of the assignee did not mean that R. S. 3477 was inapplicable to suits in the Court of Claims, but referred to claims which were excepted from the prohibition of that statute, such as "devolutions of title by force of law, without any act of parties, or involuntary assignments, compelled by law." During the following term a case was presented in which an assignee in bankruptcy had sued the United States on a claim of the bankrupt. This Court held the suit maintainable despite R. S. 3477, on the ground that

> "The act of Congress of Feb. 26, 1853, to prevent frauds upon the treasury of the United States, which was the subject of consideration in the *Gillis Case,* applies only to cases of voluntary assignment of demands against the government. It does not embrace cases where there has been a transfer of title by operation of law. The passing of claims to heirs, devisees, or assignees in bankruptcy are not within the evil at which the statute aimed; nor does the construction given by this court deny to such parties a standing in the Court of Claims." *Erwin* v. *United States,* 97 U. S. 392, 397 (1878).

This construction of R. S. 3477—that assignments by operation of law are not within the prohibition of the statute—was recognized as settled law in *Goodman* v. *Niblack, supra,* and has been repeated with approval in a great many subsequent cases.[11]

The Government now contends, contrary to the statements in all of the cases approving *Erwin* v. *United States,*

---

[11] See, *e. g., St. Paul & Duluth R. Co.* v. *United States,* 112 U. S. 733, 736; *Butler* v. *Goreley,* 146 U. S. 303, 311; *Hager* v. *Swayne,* 149 U. S. 242; *Ball* v. *Halsell,* 161 U. S. 72, 79; *Price* v. *Forrest,* 173 U. S. 410, 421; *National Bank of Commerce* v. *Downie,* 218 U. S. 345, 356; *Western Pacific R. Co.* v. *United States,* 268 U. S. 271, 275.

*supra,* that an assignment by operation of law is not always exempt from the bar of R. S. 3477, but that in addition the assignment must be of a kind that will not involve the Government in the procedural difficulties previously referred to. All of the cases in which R. S. 3477 has been held inapplicable on the ground of assignment by operation of law are explained as presenting situations in which the Government could suffer no such procedural embarrassments. In cases of transfer by descent (*Erwin* v. *United States, supra*), consolidation of corporations (*Seaboard Air Line R. Co.* v. *United States,* 256 U. S. 655 (1921)), and purchase at a judicial sale in a corporate reorganization (*Western Pacific R. Co.* v. *United States,* 268 U. S. 271 (1925)) it is pointed out that the Government may deal with the substituted representative as it would have dealt with the claimant if there had been no substitution. Rights of counterclaim and set-off are said to be retained against the universal successor, while such universal assignments by operation of law can give rise to no controversies as to the existence and extent of the transfer for adjudication between the United States and the original claimant and his trustee, receiver, or administrator.

Without considering whether some of the cases are not comprehended within this rationale,[12] we do not think that it explains the exception made for transfers by operation of law in the cases referred to. In the first place, the Court has always stated the flat exception of *all* transfers by operation of law, as distinguished from voluntary transfers. If the cases rest upon the premise advanced by the Government, it has never been articulated in the opinions. In the second place, and consistent with

---

[12] For example, transfers by will or intestacy, which are not within the prohibition of R. S. 3477 under the cases, would obviously multiply the persons with whom the United States must deal and might very well embroil it in conflicting claims.

the exception of all transfers by operation of law, this Court has a number of times indicated that neither of the purposes of R. S. 3477 is contravened by transfers by operation of law. In *Goodman* v. *Niblack, supra,* it was held that:

> "The language of the statute, 'all transfers and assignments of any claim upon the United States, or of any part thereof, or any interest therein,' is broad enough (*if such were the purpose of Congress*) to include transfers by operation of law, or by will. Yet we held it did not include a transfer by operation of law, or in bankruptcy, and we said it did not include one by will. The obvious reason of this is that *there can be no purpose in such cases to harass the government* by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim, and that the exigencies of the party who held it justified and required the transfer that was made." (102 U. S. at 560; italics added.) See also *Hager* v. *Swayne,* 149 U. S. 242, 247–48 (1893).

The fact that some administrative problems may be the unintended by-products of an involuntary assignment was not thought to be an evil within the scope of a statute aimed at fraud and harassment. That interpretation has, for nearly a century, exempted all transfers by operation of law from the prohibition of R. S. 3477.

That it was the understanding of Congress that subrogation claims were not within the bar of R. S. 3477 when it passed the Tort Claims Act is abundantly clear from a number of different particulars:

1. The Small Tort Claims Act of 1922[13] provided that heads of departments may "consider, ascertain, adjust, and determine any claim . . . on account of damages to

---

[13] 42 Stat. 1066, 31 U. S. C. § 215.

or loss of privately owned property where the amount of the claim does not exceed $1,000, caused by the negligence of any officer or employee of the Government acting within the scope of his employment." Such claims as were found due were certified to Congress for payment. A question was directed to the Attorney General in 1932 as to "whether such a claim, which if made by the owner of the property damaged could have been certified, may properly be certified if made by an insurance company which has become subrogated to the rights of the owner to receive compensation for the damage suffered." Attorney General Mitchell's opinion [14] was: (1) that subrogation is a transfer by operation of law of the right to receive payment of the amount due; and (2) that R. S. 3477 applies only to cases of voluntary assignment of demands against the Government. He thought, however, that inasmuch as the question was one concerning the purpose and intent of Congress in enacting the Small Tort Claims Act, that body should be asked to interpret the statute by passing upon subrogation claims certified to it and expressly called to its attention. Thereafter subrogation claims in the names of insurance carriers were regularly submitted to Congress and were consistently approved until the Act was repealed by the present Tort Claims Act. The Attorney General's opinion was approved and congressional acquiescence noted by the Comptroller General in opinions in 19 Comp. Gen. 503, 21 Comp. Gen. 341, and 22 Comp. Gen. 611. A unique interpretation by Congress of its own statute thus settled the question whether R. S. 3477 was a bar to subrogation claims under the Small Tort Claims Act, which, in language nearly identical with that of the present Tort

---

[14] Reported at 36 Op. Atty. Gen. 553. See Holtzoff, *Handling of Tort Claims Against the Federal Government*, 9 Law & Contemp. Prob. 311, 318; *The Federal Tort Claims Act*, 42 Ill. L. Rev. 344, 349.

Claims Act, permitted recovery "on account of damages to or loss of privately owned property . . . ."

2. That specific reference in the statute was necessary to preclude recovery by subrogees in their own names (*i. e.*, that R. S. 3477 is inapplicable to subrogees) was clearly the view of Congress when it enacted the Tort Claims Act. For in foreign claims legislation where it intended that result, Congress explicitly provided that Claims Officers should consider, ascertain, determine, and pay claims on account of injury or death, or property loss or damage to claimants in foreign countries, "including claims of insured but excluding claims of subrogees." [15] The purpose of this provision, which was enacted in 1943, was to fulfill the very office which petitioner now contends is performed by R. S. 3477.[16] No such exception is found in the Tort Claims Act, although other exceptions are spelled out with great particularity. The significance of this provision in the foreign claims statute is, first, that when Congress wished to exclude claims by subrogees it said so; and second, that Congress did not think R. S. 3477 performed that function. For a similar provision, see 49 Stat. 2194.[17]

---

[15] 57 Stat. 66, 31 U. S. C. § 224d.

[16] The House Committee Report states that "Such a provision of law leaves undisturbed, as between the parties, the rights of the insured and of insurance companies and others who have become subrogated to the rights of the owners of the property or of the person who is injured or whose death results, but permits the Government to settle with a single claimant and without the necessity of inquiry into, or determination of, the relative rights of the parties." H. R. Rep. No. 312, 78th Cong., 1st Sess., p. 2.

[17] That members of the House Committee on Claims were aware of the problem of recovery by insurance carrier-subrogees at the time the Tort Claims Act was passed is demonstrated by that Committee's report, submitted less than two weeks prior to passage of the Act, on subrogation claims presented by insurance companies in connection with the crash of an army airplane into the Empire

3. Nor did executive departments themselves interpret R. S. 3477 as applicable to subrogation claims, as the report of the hearings on H. R. 6442, 77th Cong., 2d Sess. (1942) makes plain. That bill, which was drafted by the Treasury Department, would have required subrogees to institute actions against their subrogors in some court of competent jurisdiction, which would then restrain the original claimant from receiving any funds from the Government until final decision was reached as to who was to receive the money. The Assistant General Counsel of the Treasury, in explaining the bill, stated:

"In 1877 the Supreme Court, in the case of *U. S. v. Gillis* (95 U. S. 407), after stating in effect that

State Building. The War Department had recommended to Congress that Empire State, Inc., and other private claimants be paid their uninsured losses (which was done) but refused to recommend payment of insured losses. H. R. 6683 was introduced "to appropriate the sum of $143,279.94 to 22 fire-insurance companies in full satisfaction of their subrogation claims against the United States . . . ." The Committee made specific reference to Attorney General Mitchell's opinion, noted that since that time the War Department had paid subrogation claims of less than $1,000 under the Military Claims Act, 31 U. S. C. § 223, and disapproved that department's refusal to certify claims of over $1,000. To the assertion that Congress had consistently refused to recognize subrogation claims as barred by R. S. 3477, the Committee report contains the flat denial: "That statement is not in accordance with the fact" and cites a number of subrogation claims favorably acted upon by Congress. The bill was favorably reported, H. R. Rep. No. 2655, 79th Cong., 2d Sess., but nine days later the Tort Claims Act was passed, § 131 of which provided that no private bill should authorize payment of money for claims for which suit might be brought under that Act, extending retroactively to claims accruing after January 1, 1945. Since the claims involved had accrued subsequent to that date, the insurance company subrogees brought suit in a federal district court, where the Government once more interposed a defense based on R. S. 3477, despite the Committee's specific approval of payment directly to the subrogees. The defense was rejected. *Niagara Fire Ins. Co.* v. *United States,* 76 F. Supp. 850.

section 3477 was of universal application and covered all claims against the United States in every tribunal in which they might be asserted, indicated in language not necessary to the decision that transfers or assignments compelled by law or resulting from the operation of law might not have been within the purview of section 3477.

"Now from that time on one exception after another has been carved from section 3477, until now the courts recognize many types of adverse claims as the basis for what in effect are third-party suits against the Government, including suits based upon assignments by operation of law, subrogation, and equitable liens." Hearings before Subcommittee No. 3 of the House Committee on the Judiciary, on H. R. 6442, 77th Cong., 2d Sess. (1942), at p. 3.

It cannot therefore be seriously contended that Congress and the executive departments were not cognizant of the exemption of subrogation claims from R. S. 3477 when the Tort Claims Act was passed. The broad sweep of its language assuming the liability of a private person, the purpose of Congress to relieve itself of consideration of private claims, and the fact that subrogation claims made up a substantial part of that burden are also persuasive that Congress did not intend that such claims should be barred.

If, then, R. S. 3477 is inapplicable, the Government must defend suits by subrogees as if it were a private person. Rule 17 (a) of the Federal Rules of Civil Procedure, which were specifically made applicable to Tort Claims litigation,[18] provides that "Every action shall be prosecuted in the name of the real party in interest," and of course an insurer-subrogee, who has substantive equitable rights, qualifies as such. If the subrogee has paid

---

[18] Formerly 28 U. S. C. § 932. See note 8, *supra*.

an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name.   3 Moore, Federal Practice (2d ed.) p. 1339.   If it has paid only part of the loss, both the insured and insurer (and other insurers, if any, who have also paid portions of the loss) have substantive rights against the tortfeasor which qualify them as real parties in interest.

In cases of partial subrogation the question arises whether suit may be brought by the insurer alone, whether suit must be brought in the name of the insured for his own use and for the use of the insurance company, or whether all parties in interest must join in the action. Under the common-law practice rights acquired by subrogation could be enforced in an action at law only in the name of the insured to the insurer's use, *Hall & Long* v. *Railroad Companies,* 13 Wall. 367 (1872); *United States* v. *American Tobacco Co., supra,* as was also true of suits on assignments, *Glenn* v. *Marbury,* 145 U. S. 499 (1892). Mr. Justice Stone characterized this rule as "a vestige of the common law's reluctance to admit that a chose in action may be assigned, [which] is today but a formality which has been widely abolished by legislation." *Aetna Life Ins. Co.* v. *Moses,* 287 U. S. 530, 540 (1933).   Under the Federal Rules, the "use" practice is obviously unnecessary, as has long been true in equity, *Garrison* v. *Memphis Insurance Co.,* 19 How. 312 (1857), and admiralty, *Liverpool & Great Western Steam Co.* v. *Phenix Insurance Co.,* 129 U. S. 397, 462 (1889).   Rule 17 (a) was taken almost verbatim from Equity Rule 37.   No reason appears why such a practice should now be required in cases of partial subrogation, since both insured and insurer "own" portions of the substantive right and should appear in the litigation in their own names.

Although either party may sue, the United States, upon timely motion, may compel their joinder.   *Delaware County* v. *Diebold Safe & Lock Co.,* 133 U. S. 473, 488

(1890) (applying a state code under the Conformity Act). 3 Moore, Federal Practice (2d ed.) p. 1348. Both are "necessary" parties. Rule 19 (b), Federal Rules of Civil Procedure.[19] The pleadings should be made to reveal and assert the actual interest of the plaintiff, and to indicate the interests of any others in the claim. Additional parties may be added at any stage of the proceedings, on motion of the United States, upon such terms as may be just. Rule 21.

It is true that under this rationale, there will be cases in which all parties cannot be joined because one or more are outside the jurisdiction, and the court may nevertheless proceed in the action under Rule 19 (b). In such cases the United States, like other tortfeasors, may have to defend two or more actions on the same tort and may be unable to assert counterclaims and offsets against the original claimant upon unrelated transactions.[20]

---

[19] They are clearly not "indispensable" parties under the familiar test of *Shields* v. *Barrow,* 17 How. 130, 139 (1855), that such parties have "an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." See *Delaware County* v. *Diebold Safe & Lock Co.,* 133 U. S. 473, 488 (1890); *Hubbard* v. *Manhattan Trust Co.,* 87 F. 51; *Rogers* v. *Penobscot Mining Co.,* 154 F. 606; 3 Moore, Federal Practice (2d ed.) p. 2178.

[20] The counterclaim statute, 28 U. S. C. § 1346 (c), confers jurisdiction on district courts over any "counterclaim, or other claim or demand whatever on the part of the United States against any *plaintiff* commencing an action." The offset statute, 31 U. S. C. §§ 71, 227, directs the deduction from judgments and allowed claims against the United States of debts as to which "the *plaintiff* therein shall be indebted to the United States." (Italics added.) We need not and do not consider what rights of counterclaim and set-off may lie in the United States in suits brought by insurer-subrogees. Cf. *United States* v. *Munsey Trust Co.,* 332 U. S. 234 (1947); *Defense Supplies Corp.* v. *United States Lines Co.,* 148 F. 2d 311.

If R. S. 3477 is inapplicable, as we think is clearly the case, these objections have no legal foundation upon which to rest. In argument before a number of District Courts and Courts of Appeals, the Government relied upon the doctrine that statutes waiving sovereign immunity must be strictly construed. We think that the congressional attitude in passing the Tort Claims Act is more accurately reflected by Judge Cardozo's statement in *Anderson* v. *Hayes Construction Co.,* 243 N. Y. 140, 147, 153 N. E. 28, 29–30: "The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced."

The decision of the Court of Appeals in each of these cases is

*Affirmed.*

MR. JUSTICE BLACK dissents.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.